**CHRYSLER CORPORATION, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator, Respondents.**

No. 78–2273.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 29, 1980.

Decided June 19, 1980.

James A. Hourihan, Washington, D. C., with whom Gail Starling Marshall, Washington, D. C., was on brief, for petitioner.

Charlotte Uram, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Angus Mac-Beth, Atty., Dept. of Justice, Joan Z. Bernstein, Gen. Counsel, Environmental Protection Agency, and Gerald K. Gleason, Atty., Environmental Protection Agency, Washington, D. C., were on brief, for respondents. Kevin L. Bromberg, Atty., Environmental Protection Agency, Washington, D. C., also entered an appearance for respondents.

Before WRIGHT, Chief Judge, and McGOWAN and MIKVA, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

Chrysler Corporation has petitioned for review of a final order of the Administrator of the Environmental Protection Agency (EPA), issued on November 20, 1978, directing Chrysler to recall all 1975 vehicles equipped with 360 and 400 cubic inch displacement (CID) engines having two-barrel carburetors and catalytic converters.[1] The Administrator determined that a substantial number of the vehicles in the recall class fail to conform to the applicable carbon monoxide emission standards when in actual use, even though they have been "properly maintained and used." Having found this violation of Section 207(c)(1) of the Clean Air Act, 42 U.S.C. § 7541(c)(1) (Supp. II 1978),[2] the Administrator ordered

---

1. We will denote these vehicles as the "recall class." We assume that the Administrator's order does not include 1975 vehicles sold in California, equipped with air pumps.

2. The Clean Air Act as we know it, 42 U.S.C. §§ 7401 *et seq.* (Supp. II 1978), is a composite of many acts passed by Congress. *See* Clean Air Act of 1963, Pub.L.No.88–206, 77 Stat. 392;

Chrysler to submit a plan for remedying the nonconformity. Jurisdiction of this court is pursuant to Section 307(b) of the Act, 42 U.S.C. § 7607(b) (Supp. II 1978).

Chrysler has sold approximately 208,000 vehicles in the recall class, all equipped with catalytic converters designed to reduce carbon monoxide emissions to within federal standards. Not long after these vehicles had been sold, however, EPA discovered that many of them were failing to meet the standards. After extensive tests EPA determined that excessive emissions were primarily caused by misadjustment of the carburetor idle mixture of the vehicles. The Agency gathered evidence that the misadjustments were the inevitable result of certain defects in the design of the emission control system of the recall class, and later initiated an administrative proceeding to require Chrysler to recall the vehicles and correct this design. An initial hearing before an Administrative Law Judge (ALJ) resulted in a recall order against Chrysler, which the company appealed to the Administrator. The Administrator determined, first, that as a matter of law a manufacturer must be held responsible in a recall action for nonconformities primarily caused by design defects, provided the manufacturer foresaw or should have foreseen the consequences of the defects but failed to take available steps to obviate them, and, second, on the evidence, that Chrysler's recall class must be recalled under this standard. Chrysler disputes both of these positions.

On the legal issue Chrysler argues that since the nonconforming vehicles in the recall class were misadjusted, they were not "properly maintained" within the meaning of the Act and thus should not be recalled. On the factual issue Chrysler asserts that the Administrator's conclusions were not supported by substantial evidence in the record. Because we agree with the Administrator's interpretation of Section 207(c)(1) and determine that there was substantial evidence to support his findings of a violation, we affirm.

## I. STATUTORY FRAMEWORK

In 1970 Congress passed the Clean Air Amendments of 1970, Pub.L.No.91–604, 84 Stat. 1676, which required auto manufacturers to reduce carbon monoxide emissions by 1975 to one-tenth of former levels: to 3.4 grams per mile. *See* 36 Fed.Reg. 12657 (1971). The Administrator may, however, postpone implementation of this statutory standard on grounds of technological feasibility or other factors. *See* Section 202(b)(5) of the Act, 42 U.S.C. § 7521(b)(5) (Supp. II 1978). In 1973 the Administrator postponed implementation of the 3.4 grams per mile standard and set an interim carbon monoxide emission standard of 15 grams per mile.[3] This 15 grams per mile standard was in effect during the 1975 model year, with which we are concerned.

To comply with the Act manufacturers must design, build, and equip each new

Motor Vehicle Air Pollution Control Act, Pub.L. No.89–272, 79 Stat. 992; Clean Air Act Amendments of 1966, Pub.L.No.89–675, 80 Stat. 954; Air Quality Act of 1967, Pub.L.No.90–148, 81 Stat. 485; Clean Air Amendments of 1970, Pub. L.No.91–604, 84 Stat. 1676; Comprehensive Health Manpower Training Act of 1971, Pub.L. No.92–157, 85 Stat. 431, 464; Energy Supply and Environmental Coordination Act of 1974, Pub.L.No.93–319, 88 Stat. 246; Clean Air Act Amendments of 1977, Pub.L.No.95–95, 91 Stat. 685; Safe Drinking Water Amendments of 1977, Pub.L.No.95–190, 91 Stat. 1393, 1399. The Act was formerly codified at 42 U.S.C. §§ 1857 *et seq.* (1976).

**3.** 38 Fed.Reg. 10317 (1973). This postponement was in response to this court's decision in *Internat'l Harvester Co. v. Ruckelshaus*, 478

F.2d 615 (D.C.Cir. 1973). It was the first of many postponements. In 1974 Congress postponed the effective date to 1977. Energy Supply and Environmental Coordination Act of 1974, Pub.L.No.93–319, § 5, 88 Stat. 246, 258. In 1975 the Administrator suspended the rules for one year, until 1978. 40 Fed.Reg. 11900 (1975). In 1977 Congress again postponed the effective date, to 1981. 1977 Amendments to the Clean Air Act, Pub.L.No.95–95, 91 Stat. 685, 751, *see* 42 U.S.C. § 7521(b)(1)(A). Most recently, the Administrator granted a further reprieve from the 3.4 grams per mile standard to Chrysler's 1981 line of front-wheel-drive cars, code-named "K-cars." *Washington Post*, March 19, 1980, at E1, col. 1; *see* 45 Fed.Reg. 17914 (1980) (containing a list of models exempt from the 3.4 grams per mile standard).

vehicle to conform to emission standards at the time of sale and to be free from defects in material or workmanship that would cause the vehicle to fall below the standards within a five-year or 50,000-mile period after sale. Section 202(a)(1), (d)(1), 42 U.S.C. § 7521(a)(1), (d)(1) (Supp. II 1978). Manufacturers must provide a warranty to purchasers to this effect. *Id.* § 207(a)(1), 42 U.S.C. § 7541(a)(1). If the purchaser of a vehicle maintains and operates it in accordance with the written instructions of the manufacturer, *see id.* § 207(c)(3), 42 U.S.C. § 7541(c)(3), and it fails to conform to emission standards during the warranty period (thus subjecting the owner to penalty or other sanction) the manufacturer must remedy the nonconformity at its own expense. *Id.* § 207(b), 42 U.S.C. § 7541(b).

To ensure compliance with the Act EPA conducts a three-stage testing process. Under authority of Section 206(a), 42 U.S.C. § 7525(a), the Agency examines prototypes of new vehicles or new vehicle engines to determine whether they will conform to the emission standards and issues a "certificate of conformity" to vehicles passing this test. As a part of this examination the Agency inspects the written maintenance and use instructions provided to the purchasers. Until the 1977 amendments went into effect the Agency determined whether such instructions were "reasonable and necessary to assure the proper functioning" of the emission control system. Section 207(c)(3), 42 U.S.C. § 1857f-5a(c)(3) (1976).[4] The

second stage of the testing process takes place after vehicles come off the assembly line. At this time the Agency examines sample vehicles to ensure that they conform to the requirements of the Act. Authority to conduct this examination derives from Section 206(b), 42 U.S.C. § 7525(b) (Supp. II 1978). If the Administrator determines that some or all of the vehicles off the assembly line fail to conform to the applicable regulations, he must suspend the certificates of conformity for those vehicles until the manufacturer corrects the deficiency.

The third stage of the testing process takes place while the vehicles are in actual use. EPA and related state agencies test sample vehicles to determine whether they continue to satisfy emission standards during the statutory period. If a "substantial number" of the vehicles in any class or category fail to conform to the emission standards "although properly maintained and used" by the owner, then the Administrator must notify the manufacturer and require it to submit a "plan for remedying the nonconformity" at the manufacturer's expense. Unlike the discovery and cure of nonconformity of individual vehicles under the warranty provisions, the remedy at this stage is recall of the *entire class* of vehicles in order to correct the design, material, or workmanship defect causing the nonconformity. This provision—Section 207(c)(1) of the Act, 42 U.S.C. § 7541(c)(1) (Supp. II 1978)[5]—is the statutory basis for the order under review.

**4.** Prior to the 1977 amendments § 207(c)(3), 42 U.S.C. § 1857f-5a(c)(3) (1976), provided in relevant part:

The manufacturer shall furnish with each new motor vehicle or motor vehicle engine such written instructions for the maintenance and use of the vehicle or engine by the ultimate purchaser as may be reasonable and necessary to assure the proper functioning of emission control devices and systems. * *

Section 207(c)(3)(A), 42 U.S.C. § 7541(c)(3)(A) (Supp. II 1978), now provides, in relevant part:

The manufacturer shall furnish with each new motor vehicle or motor vehicle engine written instructions for the proper maintenance and use of the vehicle or engine by the ultimate purchaser and such instructions

shall correspond to regulations which the Administrator shall promulgate. * * *

**5.** Section 207(c)(1), 42 U.S.C. § 7541(c)(1) (Supp. II 1978), provides, in relevant part:

If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the regulations prescribed under section 7521 of this title, when in actual use throughout their useful life (as determined under section 7521(d) of this title), he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given. The plan shall provide that the non-

## II. THE RECALL CLASS

### A. Design of the Emission Control System

To reduce carbon monoxide emissions and bring its vehicles into conformity with the interim federal standards Chrysler, like the other American auto manufacturers, installed catalytic converters in its 1975 model year vehicles. A catalytic converter can reduce carbon monoxide emissions by 60–80 percent by promoting a chemical reaction among the carbon monoxide, hydrocarbons, and oxygen. This reaction produces two harmless byproducts, carbon dioxide and water.[6]

An adequate supply of oxygen in the exhaust stream is essential to effective operation of the catalytic converter. Unless there is enough oxygen to oxidize all the emissions, the catalytic converter will begin to work poorly and at some point cease to operate altogether.[7] There are two major methods of supplying enough oxygen: installation of an air pump to introduce additional oxygen into the system, and precise adjustment of the carburetor idle to ensure that sufficient oxygen is mixed with the fuel. The principal disadvantage of air pumps is that they increase the cost of the system by about $50 per car[8]; they also decrease gasoline mileage[9] and may in some cases inhibit proper oxidation of the emissions.[10] On the other hand, Chrysler engineers recognized that air pumps generally decrease emissions more effectively than does the carburetor idle adjustment system. It was for just that reason that Chrysler used air pumps in its 1975 model year vehicles subject to the more stringent emission standards of California.[11] Nevertheless, Chrysler did not use air pumps in the recall class vehicles it sold in other states, because Chrysler engineers thought them unnecessary to achieving compliance with federal standards.[12] Instead, Chrysler decided to rely on the carburetor adjustment method to ensure an adequate supply of oxygen to the catalytic converter.

The company instructed owners to take their vehicles to a mechanic for servicing at intervals of 15,000 miles or whenever they

conformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer. * * *

6. Joint Appendix (JA) I:357 (Gockel testimony); JA III:1217 (Decision and Order). This opinion will refer to the testimony of the following EPA witnesses: Mr. Roy Reichlen, an EPA environmental engineer; Mr. Charles Dietrick, an EPA aerospace and mechanical engineer involved in investigating emission nonconformities; Mr. John White, project manager for large-scale emission testing programs; Mr. Barry D. Nussbaum, an EPA data analyst; Professor Nozer Singpurwalla, an expert witness on statistics; Mr. Jack L. Gockel, a pollution control consultant; Mr. John P. DeKany, director of EPA's Emission Control Technology Division; and Mr. Peter E. Kohnken, team leader of EPA's inspection unit that certified the recall class. The opinion will also refer to the testimony of the following Chrysler witnesses: Mr. Carlos M. Heinen, Chrysler's director of Emissions/Fuel Economy Certification and Materials Engineering; Mr. G. W. Robertson, chief engineer of Emissions/Fuel Economy at Chrysler; Mr. Forrest Cook, a mechanical engineer employed by Carter Carburetor Company; Mr. Harry Sherwin, a carburetor design engineer for Holley Carburetor Division of Colt Industry Operating Corporation; Mr. Miles Brubacher,

an independent consulting engineer; Mr. James Freers, a mechanical engineer employed by Chrysler; Mr. Robert Harris, product development supervisor in the Fuel Metering Systems Laboratory of Chrysler; and Mr. Goodwillie, a Chrysler engineer working with carburetors and emission controls.

7. JA I:356–357 (Gockel testimony); JA III:1217 (Decision and Order).

8. JA I:378 (Gockel testimony); JA III:1224 (Decision and Order).

9. JA III:1224 (Decision and Order). The Administrator stated that air pumps cause "a slight reduction in fuel economy," but that the precise amount of the reduction was not established in the record. JA III:1224. A Chrysler engineer stated that tests of California vehicles equipped with air pumps revealed a reduction in fuel economy of approximately 5%. JA II:732–733 (Goodwillie testimony).

10. JA II:664 (Heinen testimony).

11. JA I:15 (Heinen testimony).

12. JA I:15–16 (Heinen testimony); JA II:732–733 (Goodwillie testimony).

detected a malfunction.[13] If all went well, the mechanic would adjust the carburetor precisely in accord with Chrysler's instructions, as detailed in the service manual [14] and summarized on a permanent label affixed to the underside of the engine hood.[15] By means of this adjustment enough oxygen would be mixed with the fuel in the idle circuit to enable the catalytic converter to oxidize most of the carbon monoxide in the exhaust. A correct adjustment of the fuel-air mixture in the idle circuit is called a "lean" setting, meaning a low proportion of fuel to air.[16] This setting is measured by the percentage concentration of carbon monoxide in the exhaust as detected upstream of the catalyst. Chrysler calculated that a 0.5 percent carbon monoxide setting would generally enable the catalytic converter to reduce carbon monoxide emissions to about 12 grams per mile—well within the interim standard. In order to provide a greater margin of safety, Chrysler decided to specify a 0.3 percent carbon monoxide setting.[17] When the carburetor idle is set to Chrysler's specifications, most of the vehicles pass the carbon monoxide emission standards; when the idle mixture is adjusted to "richer" levels, most of the vehicles fail the standards.[18]

Unfortunately, the idle adjustment method has apparently not worked as well in practice as in theory. EPA researchers have linked the poor emission control performance of the recall class in actual use to certain characteristics of the carburetor idle adjustment process that make precise adjustment difficult and undesirable to owners and mechanics. To explain what EPA finds to be wrong with the design of this process, we must describe in some detail the way the idle mixture is adjusted and the relation of such adjustment to driveability of the vehicles.

The adjustment process is cumbersome and time-consuming, taking the mechanic approximately 30 to 40 minutes, according to an EPA investigation.[19] The mechanic must first obtain a Chrysler Huntsville exhaust emission analyzer or other approved infrared analyzer, and must verify that it is warmed up and calibrated according to the manufacturer's instructions. He must check to see that the sample lines and connections of the sampling system for the analyzer are free of leaks, and must also warm up the vehicle's engine and allow it to idle for no more than ten minutes. Then the mechanic must remove the plug from the threaded catalyst tap on the vehicle and install the sample line of the analyzer in the tap upstream of the catalyst. This will generally require the mechanic to crawl under the car or to use a hoist. He must then start up the vehicle's engine and verify that the idle RPM and timing are within specification. At this point he must measure the idle carbon monoxide concentration. If it exceeds specified limits he must adjust the mixture screws on the carburetor to achieve a "leaner" mixture of fuel and air in the idle circuit, checking back and forth between the analyzer and the carburetor to monitor the effect of his adjustment on the idle mixture. A clockwise turn of a screw will decrease the amount of fuel discharged through the idle port and into the idle circuit; a counterclockwise turn will increase the amount of fuel, resulting in a "richer" mixture. The adjustment screws are highly

13. JA V:1695–1696 (Chrysler Owner's Manual).

14. JA V:1876–1879 (Chrysler Service Manual).

15. JA IV:1505 (Chrysler underhood label).

16. JA I:357–358 (Gockel testimony).

17. JA II:721–722, 733 (Goodwillie testimony). See also JA I:13 (Heinen testimony).

18. JA I:354–355 (Gockel testimony). Thus the primary cause of nonconformity among the recall class was misadjustment of the idle, as EPA found. JA III:1179 (Initial Decision, Find-

ings of Fact Nos. 39–41); JA III:1217–1218 (Decision and Order). See also JA I:354 (Gockel testimony).

19. JA I:402 (Gockel statement). A survey of 27 mechanics at 25 dealerships found only one mechanic who could perform the operation in less than 15 minutes. Eight took 15–20 minutes; 15 took 20–40 minutes; two took more than 40 minutes. JA V:1979. Chrysler, however, introduced evidence that the procedure takes about 14 minutes. Brief of petitioner at 80.

sensitive and must be turned in small fractions of a rotation in order to set the adjustment with sufficient precision. After making the proper adjustment the mechanic must also balance the mixture screws on a two-barrel carburetor for lowest level of hydrocarbons or smoothest idle within the prescribed specifications.[20] An EPA expert who interviewed 27 Chrysler dealership mechanics and also performed the maintenance procedures concluded that "the procedure is cumbersome, time consuming and most importantly will usually result in customer dissatisfaction." Joint Appendix (JA) I:368 (Gockel testimony).[21]

The complex and time-consuming nature of the adjustment procedure is significant because the manufacturer did not allow enough time in its reimbursement schedules for dealership mechanics to make carburetor adjustments, according to a survey of Chrysler mechanics.[22] This meant that many mechanics had to complete the specified adjustments without full compensation for their time.[23] Moreover, Chrysler did not reimburse mechanics for a second adjustment in the event a customer was dissatisfied with the results of the first,[24] as frequently happened when the idle was set to so "lean" a mixture.[25] Various alternative idle adjustment methods employed by mechanics for many years are both less time-consuming and less likely to displease the customer.[26] But as both EPA [27] and Chrysler [28] experts agree, alternative procedures are likely to produce mixtures "richer" than those needed by the emission control system.

Several specific factors make the required procedures more difficult to perform. First, the Administrator found that precisely calibrated and fully operating infrared analyzers are often unavailable, and that most dealers were not attaching the analyzers to the upstream tap, as specified by Chrysler.[29] Evidence in the record shows that 41 percent of nondealership service facilities lacked such analyzers as of August 1975.[30] Moreover, in 1975 Chrysler undertook a survey of emission testing equipment at 39 dealerships; that survey revealed that "[a] significant number of analyzers had leaks in the sampling systems large enough to cause incorrect readings." JA V:2001. One dealer in the survey had no analyzer at all; one had a "totally inoperative" analyzer; one had an analyzer so unstable that it could not be checked; one had its analyzer at the shop for repairs. Eleven other analyzers at the dealerships had major failings, such as faulty calibra-

---

**20.** JA I:232–233, 249–250 (Dietrick testimony); JA V:1876–1879 (Chrysler Service Manual). *See also* JA II:582–583, 586–587, 589 (Gockel testimony).

**21.** Chrysler disputes EPA's conclusion that the procedure is cumbersome and difficult to perform. One Chrysler engineer described the procedure as "relatively simple," JA II:829 (Freers statement); another said that the procedure could be "done by a normal guy with normal equipment," JA I:14 (Heinen testimony); a Chrysler consultant said that "it is easy for a mechanic to make a quick and precise adjustment of the idle mixture," JA I:88 (Brubacher testimony). Significantly, none of the Chrysler experts testified that it is easy to achieve satisfactory driveability when the idle is adjusted to Chrysler's specifications.

**22.** JA V:1977; *see* JA I:370, 401 (Gockel testimony).

**23.** JA I:401 (Gockel testimony).

**24.** JA I:370 (Gockel testimony).

**25.** *See* text and notes at notes 39–43 *infra*.

**26.** JA I:370, 401 (Gockel testimony). *See* JA III:1223 (Decision and Order). This problem may be compounded by the ignorance of many mechanics concerning the effect of the idle adjustments on carbon monoxide emissions. Only six of 27 dealership mechanics surveyed realized that a "rich" idle mixture will cause the catalytic converter not to work at idle; 13 actually stated that a "rich" mixture would make the catalyst work harder. JA V:1980.

**27.** JA I:370–371 (Gockel testimony); JA I:434 (DeKany testimony).

**28.** JA I:86 (Brubacher testimony); JA I:98–104 (Freers testimony).

**29.** JA III:1222 (Decision and Order).

**30.** JA I:251 (Dietrick testimony) (citing a survey conducted by Bendix Corporation under contract to EPA).

tion or a sticking carbon monoxide meter.[31] The Chrysler engineer analyzing the results flatly stated that "routine maintenance of the instruments is not performed." JA V:2001 (memorandum from A. T. Weibel to W. S. Fagley). These results are corroborated by tests undertaken by California and New Jersey.[32] Moreover, a majority of mechanics at Chrysler dealerships did not regularly use the exhaust analyzer at the catalyst probe, as required by Chrysler's instructions.[33]

A second special problem with the emission control system adopted by Chrysler is that the carburetor adjustment screws are so sensitive that tiny rotations of the screws will grossly affect the idle fuel-air mixture. A mere 1/20 of a turn of the mixture screws above Chrysler's specified adjustment range will cause a substantial increase in idle carbon monoxide.[34] A full rotation of the screw will produce an idle carbon monoxide level about 23 times Chrysler's specifications.[35] Chrysler attempts to pass this problem off, saying that it merely causes the adjustment procedure to "take slightly longer." Brief of petitioner at 65. But the sensitivity of the adjustment screws is more significant than Chrysler is willing to admit. In order for the emission control system to work, the idle mixture must be set precisely, within very narrow limits. The hypersensitivity of the screws makes misadjustments far more likely, especially if mechanics are inexperienced or pressed for time.

Chrysler attempted to alleviate the adjustment problem by installing plastic limiter caps on the idle adjustment screws. Ideally, such caps would prevent the mechanic from turning the screws to a mixture "richer" than specification. But the limiter caps are easily removed or damaged[36]; indeed, the mechanic must remove the caps in order to make certain repairs.[37] Moreover, Chrysler's limiter caps were such that even when in place they permitted adjustment of the idle mixture to levels many times "richer" than Chrysler's specifications.[38]

Most important, the Chrysler procedure often disrupts the vehicles' smooth operation. Generally speaking, a vehicle drives more smoothly and has a smoother idle with a relatively "rich" fuel-to-air mixture. "Lean" settings such as those specified by Chrysler often generate "driveability" problems and hence customer dissatisfaction. The recall class vehicles are adjustable to any setting between 0 and 8 percent carbon monoxide, as measured at the tailpipe, with "best idle" occurring between 5 and 8 percent. In contrast, the setting required for effective operation of the catalytic converter is 0.3 percent idle carbon monoxide, as measured upstream of the catalyst.[39] As a

---

31. JA I:251–252 (Dietrick testimony) (summarizing data from Chrysler survey, JA V:1997–2002). These results seemingly conflict with Chrysler's conclusion from the survey that "most analyzers were in operating condition and working with sufficient accuracy for the use for which they were intended." JA V:2001 (memorandum from A. T. Weibel to W. S. Fagley).

32. The California report, JA V:1881, stated that "the emissions analyzers in these facilities were in such poor condition that [the Air Resources Board required] the repair and recalibration of 80% of the emissions analyzers." JA V:1882. See also JA V:1883 (New Jersey report).

33. JA V:1978 (EPA survey); JA V:2001 (Chrysler survey).

34. JA I:372 (Gockel testimony).

35. JA I:243 (Dietrick testimony).

36. JA I:242 (Dietrick testimony).

37. JA III:1222 (Decision and Order); see also JA V:1978–1979 (survey of dealership mechanics).

38. JA III:1190 (Initial Decision, Finding of Fact No. 102). See JA I:241–242 (Dietrick testimony) (with limiter cap in place, idle mixture could be set to an idle carbon monoxide level 10 times Chrysler's specification).

39. JA III:1189 (Initial Decision, Findings of Fact Nos. 95–96). Although the former measure of carbon monoxide was taken at the tailpipe and the latter was taken upstream of the catalyst, the results are comparable. A 0.3% carbon monoxide concentration upstream of the catalyst should generally result in close to a 0.0% reading at the tailpipe. See note 56 infra.

Chrysler engineer admitted, the "lean" idle setting specified by the Chrysler "certainly affects idle quality." JA II:875 (Harris testimony). He stated that "rich adjustment towards the area of best idle will produce better idle by definition than a leaner setting." JA II:877. In particular, he noted that at leaner settings it becomes more important to balance the carburetor precisely, so as to deliver the same fuel-air mixture to all of the cylinders. At a "lean" mixture it becomes "more likely that one cylinder or two cylinders might not be receiving the proper fuel distribution." JA II:875. Thus the idle is more likely to be rough and uneven. A large majority of dealership mechanics surveyed by EPA stated that it is not possible to achieve "acceptable engine smoothness and driveability" when the idle mixture is adjusted to Chrysler's specifications.[40] The mechanics also said that customers complain of rough idle, hesitation, poor performance, or surge when the idle mixture is properly set.[41] A significant majority admitted that they do not use the specified Chrysler procedure for adjusting the idle mixture.[42] More than two-thirds of the mechanics said that they "often" or "always" remove the carburetor limiter caps in order to make a good idle adjustment,[43] thereby indicating that they must set the idle mixture far "richer" than operation of the emission control system would permit. As the Administrator said, "Given customer dissatisfaction with the idle quality and the fact that the best idle quality is achieved at an idle setting far richer than Chrysler's specifications, mechanics are motivated to misadjust the vehicles." JA III:1219 (Decision and Order).

In comparison, most Ford vehicles in the 1975 model year were equipped with air pumps,[44] which obviate the need for precise carburetor adjustments to extremely "lean" idle mixtures. Since air pumps provide sufficient oxygen to the catalytic converter, the idle can be set at a "richer" mixture, as driveability seems to require, without disabling the emission control system.[45] Other undesirable features of the Chrysler system were also absent from most of the systems made by Chrysler's competitors. A Chrysler expert admitted that most of the idle mixture screws used by other manufacturers were "substantially" less sensitive than that used by Chrysler.[46] The limiter caps used by other manufacturers—unlike those used by Chrysler—would not permit the adjustment screws to be adjusted beyond the manufacturer's specifications.[47] Moreover, Chrysler was the only domestic auto manufacturer to install a system requiring use of an exhaust analyzer at the upstream tap.[48]

## B. Performance and Testing of the Recall Class

EPA approved the prototypes of recall class vehicles submitted for initial examina-

40. When asked "Is it possible to achieve acceptable engine smoothness and driveability when you adjust according to manufacturer's procedures and specifications?" only two of the 27 mechanics surveyed answered "yes." Fifteen answered "no"; six answered "not all of the time"; and four answered "most of the time." JA V:1977.

41. All 27 mechanics said that customers complain when the carburetor is adjusted to manufacturer's specifications. Twenty-three had received complaints of "rough" idle. Other complaints were of "hesitation," "poor performance," and "surge." JA V:1977.

42. JA V:1978.

43. JA V:1978.

44. JA II:541 (Dietrick testimony). EPA has incorrectly stated that Ford "used air pumps on *all* of its 1975 cars." Brief of respondents at 23 n.31 (emphasis added). This overstatement is contradicted by EPA's own witness, Mr. Dietrick.

45. JA III:1224 (Decision and Order).

46. JA II:676 (Cook testimony); *see also* JA I:253 (Dietrick testimony). But Chrysler also presented testimony that the angle of its idle mixture screw was within the "state of the art." JA I:29–30 (Cook testimony); *see also* JA IV:1567–1572 (charts showing idle adjustability of different carburetor models).

47. JA III:1191 (Initial Decision, Finding of Fact No. 104).

48. Chrysler admits that no domestic manufacturers employed this procedure, but points out that several foreign manufacturers did so. Reply brief of petitioner at 33.

tion and issued them a certificate of conformity.[49] However, at the second stage of testing Chrysler and EPA received preliminary indications that the emission control system of the recall class might not perform as well as expected. Early in 1975 Chrysler submitted data to EPA from tests of the vehicles as they came off the assembly line. These tests, conducted in accordance with the "Federal Test Procedure," see 40 C.F.R. § 85.075-9 (1976),[50] involved a simulated seven-mile driving cycle performed on a dynamometer.[51] Examination of the exhaust emitted by the vehicles during the simulation revealed that approximately 45 percent of the recall class vehicles coming off the assembly line did not conform to the carbon monoxide emission standard.[52] Chrysler attributed this high failure rate to the newness of the vehicles, which the company predicted would conform after being driven sufficiently to be broken in.[53] In addition, EPA received reports from four states which conducted "short" tests indicating that a large percentage of 1975 Chrysler vehicles in actual use, including those in the recall class, greatly exceeded the idle carbon monoxide concentration level specified by Chrysler, and thus were highly likely to be in violation of the federal standards.[54] Chrysler attributed these results to test conditions in the state programs and to carburetor misadjustments in the field.[55] On the basis of these early reports EPA initiated an investigation of the recall class.

The EPA investigators used data from a variety of testing programs conducted by Chrysler, four states, and EPA itself. In addition to the Federal Test Procedure results discussed above, Chrysler submitted the results of "short" tests conducted at the assembly line, at its new car preparation center in Chicago, and at five representative dealerships in Chicago. In each instance Chrysler discovered that many of the vehicles in the recall class exceeded Chrysler's specified idle carbon monoxide adjustment. Significantly, many of the vehicles registered a carbon monoxide concentration in the exhaust of 1.0 percent or higher—a strong indication that the vehicles were in violation of the 15 grams per mile federal standard.[56] The results of these tests may be summarized in tabular form:

49. JA III:1171 (Initial Decision, Findings of Fact Nos. 3-4; see also JA I:142-162 (Kohnken deposition concerning the initial examination of the recall class prototypes).

50. Cf. 40 C.F.R. § 86.127-78 (1979) (current overview of testing procedures).

51. The Federal Test Procedure takes about 12 hours to complete, and measures the mass of carbon monoxide in the exhaust emissions, expressed in grams per mile. An alternative "short" test, used by many states, takes about one minute to complete, and measures the concentration of carbon monoxide in the emissions, expressed in percentage carbon monoxide. The "short" test has been determined to correlate with the Federal test. JA I:194-195 (Dietrick testimony).

52. JA I:195 (Dietrick testimony) (summarizing Chrysler test data).

53. JA I:196 (Dietrick testimony).

54. JA I:195-196 (Dietrick testimony).

55. JA I:196 (Dietrick testimony).

56. Chrysler specifies that the idle mixture should be adjusted to register 0.3% carbon monoxide concentration in the exhaust, as measured upstream of the catalyst. See text at note 17 supra. This translates roughly into a 0.0% carbon monoxide concentration, as measured at the tailpipe, JA I:188 (Reichlen testimony), and a carbon monoxide emission of less than 12 grams per mile, JA II:721-722 (Goodwillie testimony). An idle mixture setting that registers 1.0% or more carbon monoxide concentration as measured at the tailpipe is highly likely to cause a violation of the standards, according to an EPA analysis. JA I:430, 439 (DeKany testimony); cf. JA II:722 (Goodwillie testimony). The ALJ found that 1.0% carbon monoxide tailpipe concentration is equivalent to approximately 17 grams per mile of carbon monoxide emissions. JA III:1176 (Initial Decision, Finding of Fact No. 28). Chrysler witnesses claimed that the point at which federal standards would be clearly violated is somewhere between 1.5 and 2.0% carbon monoxide. JA III:1228-1229 (Decision and Order). For purposes of reaching his decision, the Administrator opted for the higher figure. Id. The Chrysler idle test results, however, use the lower figure. We observe that every vehicle exceeding 1.0% carbon monoxide under the "short" test that was also tested under the "Federal" procedure exceeded the 15 grams per

Chrysler "Short" Test Results [57]

| Number and Type of Vehicle | Percentage Misadjusted | Percentage Over 1.0% CO |
|---|---|---|
| Off Assembly Line: | | |
| 67  360 CID vehicles | 46% | 27% |
| 78  400 CID vehicles | 27% | 17% |
| At New Car Preparation: | | |
| 48  360 CID vehicles | 33% | 27% |
| 38  400 CID vehicles | 18% | 18% |
| At Dealers: | | |
| 14  360 CID vehicles | 29% | 29% |
| 15  400 CID vehicles | 33% | 27% |

These results tend to indicate that many vehicles in the recall class were in violation of federal emission standards even before passing into the hands of purchasers.[58]

In the Washington, D. C. area EPA conducted a "short" test of recently purchased recall class vehicles. The test revealed misadjustments even more prevalent than those indicated by the Chrysler test results. Of 18 vehicles tested, 10 had received no maintenance from their owners that might affect the idle mixture, while 8 had received such maintenance. Ninety percent of the vehicles in the former category were found to be misadjusted; the average idle carbon monoxide concentration of the vehicles, as measured at the tailpipe, was 3.2 percent. Half of the vehicles that had received relevant maintenance were found to be misadjusted; the average carbon monoxide concentration was 1.8 percent.[59]

"Short" tests performed by state personnel and EPA contractors in Oregon, Ohio, Illinois, and New Jersey revealed that more than 64 percent of the tested 360 CID vehicles in the recall class, and more than 50 percent of the 400 CID vehicles, registered

mile standard. JA III:1229 n.55 (Decision and Order).

**57.** These data are derived from JA V:1812–1858 (Chrysler Idle Test Data); JA III:1182–1183 (Initial Decision, Findings of Fact Nos. 59–62); JA I:211–213 (Dietrick testimony). Since the tests were performed by Chrysler personnel, sometimes after giving warning to the dealers or preparation centers, the results might well understate the severity of the misadjustments. *See* JA I:213 (Dietrick testimony).

**58.** We note that the Administrator expressly declined to rely on this evidence of misadjustment prior to delivery of the vehicles to the ultimate purchasers:

The presiding officer also relied upon short-test data to support conclusions that the recall class vehicles are misadjusted on the assembly line or otherwise before delivery to the purchaser. However, these conclusions are based on idle CO concentration levels averaging less than 1.0%, only a small percentage of which exceed 1.0%. As previously indicated, idle CO measurements at levels below 1.5–2.0% have not been adequately shown by the limited evidence in the record to reliably predict an FTP failure when employed outside the laboratory. Consequently, I decline to accept these data as a basis for concluding that misadjustments are occurring on the assembly line, at new car prep centers, or at Chrysler dealerships before delivery of the vehicle to the purchaser. As noted by Mr. John P. DeKany, then Director of EPA's Emission Control Technology Division, " . . . definitive proof [of correlation at the 1.0% CO level] must await completion of . . . [another] program."

JA III:1232–1233 (Decision and Order) (footnotes omitted; elipses and brackets in original).

**59.** JA V:1693–1694 (new car survey); *see* JA I:213–215 (Dietrick testimony); JA I:186–189 (Reichlen testimony).

over 1.0 percent carbon monoxide concentration, as measured at the tailpipe.[60]

EPA conducted two major tests of the recall class, on which the ALJ and the Administrator primarily relied in reaching their decisions: the Emission Factor Program and the Olson Program. The Emission Factor Program tested randomly selected vehicles by various manufacturers in actual use in four different cities, without regard to their histories of maintenance or use.[61] It was conducted by independent testing laboratories under contract to EPA, with some participation by EPA personnel.[62] The investigators tested vehicles under the "Federal" procedure and other procedures, including the "short" test.[63] Eighty-five percent of the recall class vehicles registered carbon monoxide emissions in excess of the 15 grams per mile standard, under the "Federal" procedure. The average emissions of all recall class vehicles tested was over 48 grams per mile. Under the "short" test 77 percent of the recall class vehicles registered excessive carbon monoxide concentration.[64]

Unlike the Emission Factor Program, the Olson Program was specifically designed to test whether vehicles in the recall class, although properly maintained and used, were in violation of the carbon monoxide emission standards.[65] EPA contracted with Olson Laboratories of Livonia, Michigan to conduct the test. Olson personnel obtained a randomly-ordered list of owners of all recall class vehicles in Wayne County, Michigan, and contacted these owners by letter and telephone in an attempt to persuade them to participate.[66] On the basis of questionnaires and inspections EPA personnel eliminated all vehicles that failed certain criteria, including some maintenance requirements.[67] Vehicles not falling within these exclusionary criteria were tested by Olson, EPA, and Chrysler personnel. If these investigators found any disablement of the emission control system or other tampering, they eliminated the tampered vehicle from the test.[68]

The distinctive feature of the Olson Program was that the investigators tested vehicles in the condition in which they were received, then performed extensive maintenance, including adjustments of the idle mixture in accordance with Chrysler's specifications, and finally tested them a second time. In this way EPA could determine the effect of maintenance and idle adjustment on carbon monoxide emissions. Before receiving maintenance 90 percent of the vehi-

**60.** JA III:1176 (Initial Decision, Findings of Fact Nos. 28–29).

**61.** JA I:261–265 (White testimony). The random selection process broke down in several instances, notably in Chicago and St. Louis, where the investigators had to resort to media publicity and other methods to procure sample vehicles. JA II:522–523, 528–529 (White testimony). Although vehicles were not excluded from the test because of improper maintenance, EPA required owners to fill out a questionnaire concerning maintenance both before and after the test.

**62.** JA I:260 (White testimony).

**63.** JA I:196–197 (Dietrick testimony).

**64.** JA III:1175 (Initial Decision, Findings of Fact Nos. 22–23); JA I:197 (Dietrick testimony).

**65.** JA I:197 (Dietrick testimony).

**66.** These procedures are described in detail by Mr. Dietrick, who conducted EPA's investiga-

tion of the recall class, JA I:224–227, and by Mr. Nussbaum, who designed the procedures, JA I:297–311.

**67.** Vehicles were rejected from the sample if: (1) they had not been operated in accordance with Chrysler's instructions, for example, if they had been run on leaded gasoline or had been improperly used to tow trailers; (2) they had been rented or leased; (3) their emission control systems had been damaged by accident; (4) they had been driven over dirt roads more than half of the time; (5) they had been operated in a competitive speed race; (6) they had not been taken in for oil changes or tuneups at the recommended intervals; (7) their engines had received major damage or a major overhaul; (8) they had not been purchased new from a dealer; (9) they had been driven less than 1,000 or more than 50,000 miles; or (10) their emission control systems were disabled. JA I:229–230 (Dietrick testimony).

**68.** JA I:230–231 (Dietrick testimony).

cles tested in the Olson Program exceeded carbon monoxide emission standards.[69] After maintenance only 25 percent of the tested vehicles failed to satisfy the standards.[70] The results may be summarized in tabular form:

Olson Testing Program [71]

| Number and Type of Vehicle | Percentage in Violation | Average CO Emissions |
|---|---|---|
| As Received: | | |
| 10  360 CID vehicles | 100% | 69.02 grams/mile |
| 10  400 CID vehicles | 80% | 33.61 grams/mile |
| After Maintenance: | | |
| 10  360 CID vehicles | 20% | 11.35 grams/mile |
| 10  400 CID vehicles | 30% | 15.45 grams/mile |

The Administrator has called the Olson test results "[t]he most decisive and objective evidence establishing the high number of misadjustments * * *."  JA III:1225.

Of the 46 vehicles tested in the Emission Factor and Olson Programs, 37 had logged fewer than 15,000 miles.[72]  Since the 15,000-mile point is the first occasion when owners are instructed to readjust the idle mixture,[73] vehicles logging fewer than 15,000 miles might be viewed as "properly maintained."  Moreover, all nine of the vehicles logging more than 15,000 miles had been taken to service facilities for a tune-up, in accordance with Chrysler instructions—seven of them to Chrysler dealerships.[74]  A large percentage of the tested vehicles—65 percent of the Olson vehicles and 38 percent of the Emission Factor vehicles—had received unscheduled maintenance relating to the carburetor or tuning because of owner complaints concerning such driveability problems as hesitation, rough idle, stalls, hard starting, pinging, and poor fuel economy.[75]

Evidence suggests that the misadjustments occurred to some degree on the assembly line, and that they tended to become statistically more severe as mileage accumulated.  A compilation of Chrysler, state, and EPA test results, correlated according to vehicle mileage, may be summarized in tabular form:

Test Summary [76]

| Mileage | No. of Vehicles | Average Idle CO | Percentage Misadjusted | Percentage Over 1% CO |
|---|---|---|---|---|
| 0–1,000 | 17 | 1.9% | 65% | 65% |
| 1,000–5,000 | 37 | 2.2% | 73% | 68% |

**69.**  JA I:197 (Dietrick testimony); JA III:1174 (Initial Decision, Finding of Fact No. 20).  Eighteen of the 20 vehicles were set to idle mixtures "richer" than Chrysler's specifications; all of these vehicles exceeded federal carbon monoxide emission standards.  Of the two vehicles set to Chrysler's specifications, one met the standards and one exceeded the standards by a small amount (15.61 grams per mile as compared with the 15 grams per mile standard).  JA I:359–360 (Gockel testimony).  For statistical purposes, the latter vehicle is counted as meeting the standards.

**70.**  JA I:360 (Gockel testimony).

**71.**  The data are derived from the Administrator's decision, JA III:1226.

**72.**  JA I:204 (Dietrick testimony).

**73.**  JA V:1695–1696 (Chrysler Owner's Manual).

**74.**  JA I:204 (Dietrick testimony).

**75.**  JA I:207–208 (Dietrick testimony).

**76.**  The data are compiled at JA I:216 (Dietrick testimony), and derive from studies reported at JA V:1685–1694; see also JA III:1112 (Initial Decision).

| Mileage | No. of Vehicles | Average Idle CO | Percentage Misadjusted | Percentage Over 1% CO |
|---|---|---|---|---|
| 5,000–10,000 | 25 | 2.9% | 72% | 72% |
| 10,000–15,000 | 20 | 3.1% | 75% | 75% |
| Over 15,000 | 10 | 4.3% | 90% | 90% |

Evidence in the record indicates that these results are representative of cities all across the nation.[77]

EPA performed a statistical analysis of the results of the Emission Factor and Olson Programs. This analysis revealed, with 95 percent confidence, that no fewer than 79 percent of all 360 CID vehicles in the recall class, and no fewer than 62 percent of all 400 CID vehicles in the recall class, violate the carbon monoxide emission standards when in actual use. Using only the Olson Program results, EPA was able to project with 95 percent confidence that no fewer than 79 percent of the 360 CID, and no fewer than 49 percent of the 400 CID, vehicles in the recall class violate the standards in actual use.[78]

## III. THE ORDER UNDER REVIEW

### A. The Notice of Nonconformity

Relying on the results of state tests, the Emission Factor Program, and the Olson Program, the EPA Administrator, then Russell E. Train, issued a letter on December 8, 1976 instructing Chrysler to submit a plan for remedying the nonconformity of the recall class. The Administrator said that the test results showed "that a substantial number of vehicles in [the recall class] are exceeding the 1975 Federal carbon monoxide standard in actual use," and that "carburetor idle CO misadjustment is the primary cause of the nonconformity of these vehicles." JA III:912. He noted that misadjustment of the vehicles might be taken as proof that they had not been "properly maintained" under the statute, but he stated that Chrysler must nevertheless be considered liable to a recall action. He reasoned:

> Chrysler is responsible for these misadjustments because Chrysler as an automobile manufacturer should have foreseen that its carburetor design and adjustment procedures would cause widespread misadjustments and because of the agency relationship which exists between Chrysler and its authorized dealerships.

JA III:912–913.

Chrysler took issue with the Administrator's determination and demanded a public hearing before an ALJ, as provided in Section 207(c)(1) of the Act, 42 U.S.C. § 7541(c)(1) (Supp. II 1978), and EPA regulations, 40 C.F.R. § 85.1807 (1979).

### B. The Initial Decision

The case was assigned to ALJ Edward B. Finch. Both parties undertook extensive discovery, over which several disputes arose. Most important, Chrysler was not permitted to obtain some 20 EPA documents or to depose Mr. Eric Stork, head of

---

77. JA I:216–217 (Dietrick testimony); see JA III:1112 (Initial Decision).

78. JA III:1175 (Initial Decision, Findings of Fact Nos. 25–26); see JA I:319–347 (Singpurwalla testimony).

the EPA team that certified the recall class.[79] After four prehearing conferences and a lengthy public hearing in which Chrysler and EPA were the only parties, the ALJ issued an Initial Decision in favor of EPA ordering Chrysler to submit a recall plan in accordance with Section 207(c)(1). JA III:1090–1196. The ALJ delineated two major disputed issues: first, whether the test vehicles that served as the basis for the Administrator's notice of nonconformity were "properly maintained" within the meaning of Section 207(c)(1), and second, assuming that those vehicles had been "properly maintained," whether there was sufficient evidence to support the Administrator's decision that there were "a substantial number" of vehicles in the recall class that "do not conform" to the federal carbon monoxide emission standards.[80]

EPA urged the ALJ to adopt a definition of "properly maintained" that would refer solely to the actions of the vehicle owner in taking his car to a bona fide service station for Chrysler's recommended maintenance at the recommended time intervals without regard for whether the maintenance was performed properly or not. The ALJ rejected this argument, holding that "it is the actual maintenance performed on the vehicle which is the determining factor." JA III:1102. He concluded that "the phrase 'properly maintained' has a technical meaning within the automobile industry and, when used within that industry, means 'maintained in accordance with the manufacturer's [instructions or] specifications.' " JA III:1101 (brackets in original).[81] However, the ALJ ruled in effect that vehicles logging less than 15,000 miles should automatically be considered "properly maintained" because Chrysler does not require readjustment of the idle setting within the first 15,000 miles of operation.[82]

Using this definition of "properly maintained," the ALJ found substantial evidence supporting the conclusion that a substantial number of vehicles in the recall class do not conform to federal carbon monoxide emission standards. Relying on tests of low-mileage vehicles in the recall class conducted by four states and Chrysler, the ALJ determined that vehicles that "may be considered to have been properly maintained" under his definition—that is, vehicles logging less than 15,000 miles—demonstrated "gross conditions of idle misadjustment." JA III:1107.[83] Then, relying solely on the Olson and Emission Factor Programs, as analyzed in accordance with standard statistical techniques, he concluded that a "substantial number" of vehicles in the re-

79. *See* JA III:923 (Chrysler's motion to compel production of documents); JA III:985, 1002 (ALJ's orders granting Chrysler's motion in part and denying it in part). Chrysler applied to the Administrator for an interlocutory appeal, which was denied. JA III:1086.

80. JA III:1092–1093 (Initial Decision). The ALJ also discussed a third issue: whether Chrysler's maintenance instructions to the ultimate purchaser were "reasonable and necessary to assure the proper functioning of emission control devices and systems" within the meaning of § 207(c)(3). He stated that this issue was not in dispute: that both parties agree that Chrysler's maintenance instructions were "reasonable and necessary." JA III:1092–1093 (Initial Decision).

81. The ALJ thus construed the recall provision of § 207(c)(1) to accord with the warranty provision of § 207(b). *See* JA III:1099–1100. However, the ALJ held that the burden of proof on EPA, as a third party, is lower in a recall action than that on a vehicle owner in a war-

ranty action. He held that EPA "need only show by documentation or other relevant evidence, substantial compliance with the manufacturer's instructions." JA III:1101.

82. JA III:1103–1105.

83. Chrysler argued that many of the low mileage vehicles tested had received unscheduled maintenance, *see* text at note 75 *supra,* that this maintenance was often conducted improperly, and thus that such vehicles should not be considered "properly maintained" for purposes of a recall. The ALJ rejected this argument, saying that "[w]hile the unscheduled maintenance may have been incorrect maintenance, Chrysler has not shown by any affirmative evidence that this fact is true. It would seem that in order to satisfy the customer it was the only maintenance under the circumstances when carburetor design, etc., are considered." JA III:1113–1114.

call class failed to conform to the emission standards.[84] For this purpose he disregarded the state and Chrysler investigations that·used the tailpipe exhaust, or "short," method because he did not believe that the 1.0 percent carbon monoxide concentration cutoff point used by those tests was sufficiently reliable evidence of failure to meet the federal emission standards.[85] The ALJ rejected all challenges to the validity of the Emission Factor[86] and Olson[87] Programs. Thus he reached a two-step conclusion: first, that idle misadjustments are characteristics of "properly maintained" vehicles, and second, that idle misadjustments have caused "a substantial number" of vehicles in the recall class to violate the carbon monoxide emission standards. Therefore, he found Chrysler liable to a recall action under the Act.

In addition, the ALJ held that Chrysler should be held responsible for nonconformities caused by idle misadjustments by owners and mechanics in the field. Relying primarily on precedents in the products liability area, he held:

> The Clean Air Act imposes a statutory obligation upon the manufacturer to design and produce a vehicle emission system which will, its useful life, conform to the applicable emission standards. Any failure to do so is noncompliance with the Act. The standards set forth in the Act are intended for the purpose of cleaning up the nation's air quality for the benefit of man and the environment. Any failure to accomplish such purpose by any means, including a "defect in design" carburetor, as here, constitutes a violation of the intended purposes of the Act for which liability attaches. * * *

JA III:1157–1158. EPA argued that Chrysler's emission control system design was faulty because it contained no mechanism to limit idle mixture, was overly sensitive to small turns of the adjustment screw and to

84. JA III:1146–1148. The ALJ rejected Chrysler's argument that EPA must demonstrate that 50% or more of the recall class are in violation of the standards. JA III:1140–1145.

85. See note 56 supra. Although the ALJ found the "short" tests "sufficient to indicate that an emission problem exists," he held that "they are not sufficient to enable these numbers of vehicles to be used in support of the 'substantial number' criterion of Sec. 207(c)(1)." JA III:1124.

86. Chrysler criticized the sampling technique, testing procedure, and inclusion of improperly maintained vehicles in the Emission Factor Program. The ALJ concluded, however, that there was no pre-selection of vehicles for the test, and therefore that the sampling technique was accurate for its purposes. JA III:1127. The ALJ also concluded that the slight deviations from the "Federal" test procedure either had no impact on the Emission Factor results or were more stringent than the usual procedure. Finally, he concluded that owner questionnaires and Chrysler's maintenance and warranty records were sufficient to determine that the recall class vehicles tested in the program were "properly maintained." JA III:1129.

87. In its attack on the validity of the Olson Program Chrysler argued, first, that the use of a single test site made the test geographically unrepresentative. JA III:1132. But the ALJ observed that evidence from other tests indicated that nonconformities exist to a large extent all over the country, and thus concluded that the Olson test site was representative. JA III:1133. He appeared to agree with Chrysler in theory concerning this apparent flaw in the testing procedures, but stated:

> I would agree with Chrysler if the test results of the recall class vehicles had not so conclusively shown that a substantial number of vehicles in this program were in nonconformity. It is doubtful if Wayne County residents and vehicle owners would be so completely irresponsible in the care of their vehicles so as to allow the conclusion that they are that different from the rest of the country. * * *

Id. Chrysler argued, second, that the large number of nonrespondents invalidated the results of the Olson Program. It produced evidence that the characteristics of nonrespondents to a survey offer differ significantly from those of·respondents. JA III:1134. The ALJ stated that "precision in details is not required so long as the general, broad picture of the emission problem is accurately portrayed." JA III:1136. He found that "EPA did everything humanly possible to obtain a random sample for its Olson testing program" and that "[t]here has been no purposeful bias shown to exist which would invalidate the randomness of the sample obtained." Id. Moreover, EPA produced expert evidence that the sample vehicles in the Olson Program were representative of the recall class. Id.

temperature and idling time, and contained no alternative means of providing excess air to the catalyst in the event of misadjustment.[88] Because of these alleged design defects, and tests showing that a substantial number of the recall class vehicles were in a state of misadjustment, the ALJ concluded "that the design of the emission control system, including the carburetor, encourages or fosters the gross misadjustments which have been shown to exist and therefore should have been foreseen." JA III:1158.[89]

The ALJ also concluded that Chrysler may be held responsible for misadjustments made by dealership mechanics because Chrysler dealers are agents of Chrysler in the performance of pre-delivery and warranty services and all emissions-related services.[90] He stated that Chrysler has the "right to control" dealership performance of these services,[91] and that members of the public reasonably rely on the dealers' skill and Chrysler's representations in servicing Chrysler cars.[92]

On the basis of these findings and conclusions the ALJ ordered Chrysler to submit a plan for remedying the nonconformity of the recall class, under Section 207(c)(1).

## C. The Administrator's Decision and Order

Chrysler appealed the Initial Decision of the ALJ to the EPA Administrator, Douglas M. Costle, on February 14, 1978. On the basis of appellate and supplemental briefs, but without hearing oral argument, the Administrator issued the order under review on November 20, 1978.[93]

The Administrator acknowledged that the key issue in the proceeding was whether the vehicles in the recall class were "properly maintained" within the meaning of Section 207(c)(1).[94] He reviewed the interpretations of "properly maintained" urged by EPA and Chrysler,[95] and also that adopted by the ALJ,[96] but he found that "[t]he problem with all of these interpretations of the 'properly maintained' criterion is that they place undue emphasis on the text of the words 'properly maintained' without examining the purpose or function of the 'properly maintained' criterion in the overall statutory scheme." JA III:1211–1212.[97] He reasoned that the purpose of the "properly maintained" criterion of Section 207(c)(1) was "to allocate responsibility for emission nonconformities among the manufacturer, the vehicle owner and the mechanic." JA III:1212. The manufacturer should

---

88. JA III:1148.

89. The ALJ also placed "great weight" on the evidence that the infrared gas analyzer required for idle adjustment was not in widespread use as late as September 1975. JA III:1158.

90. JA III:1159–1170.

91. JA III:1166.

92. JA III:1169.

93. The Administrator's Decision and Order appears at JA III:1199–1260.

94. JA III:1200.

95. EPA argued, as it had before the ALJ, that the phrase "properly maintained" refers solely to the owners' actions in taking the vehicle to a bona fide service facility, and does not refer to the nature of the maintenance actually performed. Chrysler argued, as it had before the ALJ, that if a vehicle is misadjusted then it is not "properly maintained." JA III:1209–1211.

96. JA III:1207–1208.

97. We are puzzled, therefore, by EPA's arguments in its brief at 60–63. It argues that the "properly maintained" criterion refers to proper maintenance only in relation to the instructions to the owners in the Owner's Manual, and not to maintenance by mechanics. See brief of respondents at 61–63. To the extent that the criterion relates to mechanics' actions, EPA asserts that it is satisfied when the "mechanics performed the repairs as reasonably as could be expected under the circumstances." Id. at 61. EPA presented these arguments to the ALJ; they were rejected. EPA presented these arguments again to the Administrator; again they were rejected. EPA is not free to present these arguments a third time to this court: the duty of the Agency attorneys is to defend the Decision and Order of the Administrator on the basis of his findings and legal conclusions. This court could not affirm the Decision and Order on the basis of EPA attorneys' twice-rejected theories of the case, even if we agreed with them.

not have to bear the expense of a recall if the fault properly lies with the vehicle operator; on the other hand, if it is principally responsible for the nonconformity the manufacturer should be held accountable, even if the nonconformity relates to maintenance of the vehicle. Otherwise, the manufacturer would be able to avoid its duty to make vehicles that would conform to the emission standards during their useful life, and could frustrate the purpose of the Act.[98] Thus the Administrator interpreted Section 207(c)(1) as imposing recall liability on the manufacturer for maintenance-related nonconformities only if EPA could establish that the vehicles would have been maintained properly *"but for the actions of the manufacturer."* JA III:1215 (emphasis in original). He describes EPA's burden of proof as the presentation of "affirmative evidence" that the manufacturer is "primarily responsible for the condition of improper maintenance." *Id.* In the case at bar the Administrator found that such affirmative evidence had been presented. He concluded, on the basis of the record, that "[w]hile that evidence also shows that the service industry does indeed contribute to the condition of improper maintenance * * *, it is clear that the service industry's contribution is the inevitable byproduct of Chrysler's emission system design and service procedures." *Id.*

In reaching this conclusion the Administrator painstakingly reviewed the evidence in the record concerning the alleged design defects in the Chrysler emission control system, including the length and difficulty of the idle adjustment procedure, the inadequacy of the plastic limiter caps, the lack of reliable infrared exhaust analyzers, the sensitivity of the adjustment screws, and the failure to install an air pump.[99] Focusing on the difficulty of sufficiently precise adjustment and resulting customer dissatisfaction, the Administrator found that these factors, "inherent in the recall class vehicles," made the likelihood of proper adjustment "exceedingly small" for vehicles in actual use. JA III:1218.[100]

Having attributed responsibility for idle misadjustments to Chrysler, the Administrator easily found sufficient evidence in the record to support a finding that a substantial number [101] of vehicles in the recall class were in violation of the emission standards as a result of such misadjustment. He relied primarily on the Olson Program to support his conclusion,[102] but found that other testing programs, including those using the "short" test, could be used to corroborate the Olson Program result: namely, "that a high number of the recall class vehicles in the field are in a condition of misadjustment." JA III:1231. The Administrator found, on the basis of the evidence from these tests, that the misadjustments were uniformly prevalent throughout the country,[103] and that they increase in frequency and severity as the mileage of the vehicles increases.[104]

Chrysler argued that the results of the Olson Program tests performed on vehicles *after* maintenance in accordance with Chrysler instructions supported its conten-

98. JA III:1212–1214, 1216.

99. JA III:1218–1224; *see* Part II–A *supra.*

100. The Administrator expressly declined to accept the ALJ's conclusion that misadjustments had occurred on the assembly line, at new car preparation centers, or at Chrysler dealerships prior to delivery to the ultimate purchasers, because this conclusion was based on data from "short" tests using a 1.0% carbon monoxide concentration level as a benchmark. JA III:1233.

101. The Administrator found it unnecessary to define a "substantial number" in this case, JA III:1250, but said that it "may vary from case to case" and that the "primary consideration is whether the number is sufficient to demonstrate the existence of an 'emissions related problem.'" JA III:1251.

102. JA III:1225.

103. JA III:1232.

104. JA III:1231. The Administrator rejected Chrysler's arguments that the Olson and Emission Factor Programs used too small and unrepresentative a sample to support EPA's conclusions, for much the same reasons given by the ALJ. JA III:1245–1250; *see* notes 86–87 *supra.*

tion that most vehicles in the recall class pass the emission standards when properly maintained. As we have noted, after maintenance about three-quarters of the recall class vehicles satisfied the standards.[105] The Administrator, however, concluded that the maintenance performed on the vehicles during the Olson Program was not the type of maintenance contemplated by Section 207(c)(1) of the Act. He said that

> the recall determination must be based upon a finding that a substantial number of vehicles exceed the applicable emission standard when "in actual use," although properly maintained and used. * * * Maintenance in actual use is where all of the factors that have been previously identified as contributing to the cause of misadjustments will combine and represent the true state of maintenance being performed on the recall class vehicles. The sensitivity of the adjustment screws, the inconvenience involved in attaching the exhaust gas analyzer at the tap in front of the catalyst, the pressure to satisfy the customer, and the incentives to complete the task in an expeditious manner all interact in a way that is totally unlike the maintenance performed in the Olson Program.

JA III:1244. Thus the Administrator relied on the "as received" portion of the Olson tests in reaching his determination.

The Administrator analyzed at length the expert testimony by Chrysler and EPA witnesses concerning the foreseeability of misadjustments of the idle mixture, given the design of the recall class.[106] He discounted the testimony of three main Chrysler witnesses and credited the testimony of EPA witnesses that the carburetor design necessarily encouraged or fostered misadjustment and should have been known by Chrysler to do so. He stated:

* * * The evidence presented by EPA in the form of expert opinion and other proof convinces me that Chrysler should have foreseen the possibility of widespread misadjustments occurring in the recall class vehicles due to the combined effects of the various factors described above and further that such misadjustments would result in a substantial number of the recall class vehicles exceeding the Federal emission standard for carbon monoxide. * *. *

JA III:1233.

Chrysler also argued that requiring a recall in this case is tantamount to retroactive rulemaking because EPA has issued new regulations that require manufacturers to construct all vehicles to meet emission standards even when misadjusted. 44 Fed.Reg. 2960 (1979). Chrysler suggested that the order now under review is, in effect, an application of this prospective rule to a past model year. The Administrator rejected this argument, saying, "The recall order is based on the fact that the defective design and service procedures *induced* misadjustments, not on the fact that the design merely *allowed* misadjustments." JA III:1257 (emphasis in original). He also rejected Chrysler's allegations of material evidentiary and discovery errors on the part of the ALJ,[107] and declined to rule on EPA's theory—adopted by the ALJ—that Chrysler was responsible for the misadjustments made by Chrysler dealers because such dealers are agents of Chrysler for the purpose of maintaining emission equipment.[108]

The Administrator therefore affirmed the ALJ's order and required Chrysler to submit a plan for correcting the nonconformities of the recall class.[109]

105. *See* table at note 71 *supra*. Applying standard statistical analysis to these data, Chrysler computed that it can be projected with 95% confidence that approximately 3.7% of the 360 CID and 8.3% of the 400 CID vehicles in the recall class would fail the standards. *See* JA III:1242.

106. JA III:1233–1239.

107. JA III:1258–1259.

108. JA III:1256–1257.

109. JA III:1259–1260. The Administrator adopted the ALJ's findings and conclusions insofar as they were consistent with the Decision and Order.

### D. The Denial of Chrysler's Motion for Reconsideration

On December 17, 1978, about one month after the Administrator released his Decision and Order in this case, EPA published a study entitled "Motor Vehicle Tampering Survey" concerning the problem of tampering with emission control systems of vehicles made by all major manufacturers.[110] Claiming that the survey introduced new evidence relevant to this case, Chrysler petitioned the Administrator for reconsideration of his Decision and Order. Chrysler contended that the survey showed that tampering with emission control systems was an industry-wide phenomenon, in no way encouraged or caused by defects in Chrysler's carburetor design.[111]

The Administrator denied Chrysler's motion for reconsideration. He analyzed the underlying raw data of the "Motor Vehicle Tampering Survey" and found that Chrysler vehicles of the 1975 model year averaged 3.87 percent carbon monoxide at idle. In contrast, 1975 General Motors vehicles averaged 1.72 percent and Ford vehicles averaged 0.88 percent.[112] He therefore found no reason to depart from his earlier findings and conclusions.

This petition for review followed.

## IV. THE MEANING OF THE "PROPERLY MAINTAINED" CRITERION IN SECTION 207(C)(1)

### A. Scope of Review

■ This case is the first contested recall action under Section 207(c)(1) to reach the courts, and we have little precedent to guide us in deciding it. The only authoritative interpretation of the relevant portions of the Act is that adopted by the Administrator in the order under review. We must accord his interpretation "important but not controlling significance." Batterton v.

Francis, 432 U.S. 416, 424, 97 S.Ct. 2399, 2404, 53 L.Ed.2d 448 (1977); see also Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971). As the Supreme Court has said, "It is the settled rule that the practical interpretation of an ambiguous or doubtful statute that has been acted upon by officials charged with its administration will not be disturbed except for weighty reasons." Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 117, 73 L.Ed. 981 (1930). Although this court has the duty under the Administrative Procedure Act, 5 U.S.C. § 706 (1976), to "decide all relevant questions of law," we recognize that the special expertise of EPA in interpreting the legislation which it is called upon to administer requires that we defer to the judgment of the Agency where that judgment is reasonable and is consistent with the language and purpose of the legislation. See generally Wilderness Society v. Morton, 479 F.2d 842, 864–870 (D.C.Cir.) (en banc), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

### B. The Statute

■ Chrysler argues that the language of Section 207(c)(1), the recall provision, is clear on its face, and that this court should reject the Administrator's interpretation even without resort to interpretive aids such as legislative history.[113] We cannot agree. Section 207(c)(1), 42 U.S.C. § 7541(c)(1) (Supp. II 1978), reads in relevant part:

> If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the [emission standards], when in actual use throughout their useful life * * * he shall require the manufacturer to submit a plan for remedying the nonconformity * * *. * * *

---

110. The survey is reprinted at JA IV:1575–1684.

111. See JA III:1263–1264 (Denial of Motion for Reconsideration). Chrysler also made other arguments pertaining to matters already addressed by the Administrator. JA III:1263.

112. JA III:1264.

113. Brief of petitioner at 19–22.

Chrysler argues—and the ALJ agreed [114] —that the phrase "properly maintained and used" must be interpreted in accordance with Section 207(b)(2)(A), 42 U.S.C. § 7541(b)(2)(A) (Supp. II 1978), the warranty provision of the Act.[115] That provision requires the manufacturer to repair or replace the emission control systems of its vehicles under certain conditions. One of those conditions is that the vehicles must have been "maintained and operated in accordance with instructions under subsection (c)(3) of this section." *Id.* Subsection (c)(3) requires manufacturers to furnish vehicle purchasers with "written instructions for the proper maintenance and use of the vehicle" in accordance with EPA regulations. 42 U.S.C. § 7541(c)(3)(A) (Supp. II 1978).[116] Thus Chrysler concludes that "proper maintenance " for the purpose of a recall action under Section 207(c)(1) must be defined as maintenance strictly in accordance with the written instructions provided to vehicle purchasers as required by Section 207(c)(3).

We agree that Chrysler has propounded one plausible interpretation of the Act, but we cannot agree that no other interpretation is possible. First, Chrysler's interpretation does not account for the difference in language between Section 207(c)(1), which limits a recall to classes of vehicles that had been "properly maintained and used," and Section 207(b)(2)(A), which limits warranty claims to vehicles that had been "main-

tained and operated in accordance with [the manufacturer's written] instructions[.]" "Properly" in this context *may* mean the same thing as "in accordance with [the manufacturer's written] instructions," as Chrysler says. On the other hand, the difference in language may indicate a subtle difference in meaning. In a warranty action the individual vehicle owner seeks to shift his cost of repairing the emission control system to the manufacturer; he has every incentive to produce documentation to prove that he had maintained his vehicle in accordance with the manufacturer's instructions. In a recall action, however, the Administrator seeks to require a remedy for an entire class of vehicles; he may not be able to obtain precise documentation of the maintenance that was performed.[117] His emphasis must be on systemic, class-wide defects in the design or construction of the emission controls, rather than on individual breaches of the warranty.[118] Such systemic defects may be revealed in vehicles deviating somewhat from the precise specifications of the manufacturer. It is possible, therefore, that Congress intended the "properly maintained" requirement of Section 207(c)(1) to be more flexibly interpreted than the "maintained and operated in accordance with [the manufacturer's written] instructions" requirement of Section 207(b)(2)(A).[119]

114. JA III:1099–1100. *But see* note 119 *infra.*

115. Section 207(b)(2), 42 U.S.C. § 7541(b)(2) (Supp. II 1978), provides in relevant part:

[The Administrator] shall prescribe regulations which shall require manufacturers to warrant the emission control device or system of each new motor vehicle or new motor vehicle engine * * *. The warranty under such regulations shall run to the ultimate purchaser and each subsequent purchaser and shall provide that if—

(A) the vehicle or engine is maintained and operated in accordance with instructions under subsection (c)(3) of this section,

(B) it fails to conform at any time during its useful life * * * to the [federal emission standards], and

(C) such nonconformity results in the ultimate purchaser having to bear any penalty or other sanction * * *,

then such manufacturer shall remedy such nonconformity under such warranty with the cost thereof to be borne by the manufacturer. * *

116. For the text of § 207(c)(3)(A), *see* note 4 *supra.*

117. *See* JA III:1101 (Initial Decision).

118. *See* 1 United States Environmental Protection Agency, General Counsel Opinions, Air Pollution 105, 111–112 (1979).

119. Chrysler seems to misunderstand the Administrator's Decision and Order on this point; it says in its reply brief that the Administrator agreed with the ALJ that the maintenance clauses of subsections (b)(2)(A) and (c)(1) have the same meaning. Reply brief of petitioner at 7–8. However, the pages of the Decision and Order cited by Chrysler on this point, JA

Second, Chrysler's proposed interpretation fails to give full effect to the phrase "when in actual use" in Section 207(c)(1). This language might be taken to indicate that Congress was concerned with everyday conditions, not with an ideal world in which the technical instructions of the manufacturer are obeyed to the letter. If—as the Administrator found—the design of Chrysler's emission control system and maintenance procedures encouraged or fostered improper maintenance by ordinary owners and mechanics, we cannot say that Section 207(b)(2)(A) or any other section of the Act would preclude the Administrator from requiring a recall.

We therefore must look to the legislative history of the Act and to the function and purpose of the "properly maintained" language in the statutory scheme to see whether the Administrator's interpretation can be sustained.

## C. Legislative History

Prior to the Clean Air Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676, there was no system of in-use testing of vehicles. Thus Section 207 represented "a significant departure from prior provisions for control of vehicle emissions." S.Rep. No. 1196, 91st Cong., 2d Sess. 29 (1970), reprinted in Library of Congress Congressional Research Service Environmental Policy Division, 93d Cong., 2d Sess., 1 A Legis-

lative History of the Clean Air Amendments of 1970 at 429 (Committee Print 1974) (hereinafter cited as Leg.Hist.). Under the earlier scheme compliance with national emission standards was judged by tests of prototype models and samples of production-line vehicles.[120] If a class of vehicles satisfied this test, then emission standards were presumed met. As data became available on the performance of these certified vehicles in actual use, however, federal officials found that emission control performance seriously deteriorated after sale. A study by the National Air Pollution Control Administration concluded that more than half of the previously-certified vehicles in actual use in the spring of 1968 failed to satisfy either the hydrocarbon or the carbon monoxide standard. One model registered an 80 percent failure rate.[121]

Faced with this problem, Congress resolved to require manufacturers to construct vehicles that would satisfy performance tests as well as design and production tests. Senator Muskie, principal spokesman for the bill, said, "So what we are concerned about is not only the tests or the standards that the cars meet while they are in the factory, but also whether or not they continue to meet these standards afterward." 116 Cong.Rec. 33093 (1970), reprinted at Leg.Hist. 330. As we have already noted,[122] the performance requirements were to be

III:1207–1208, merely summarized the interpretation suggested by the parties and the ALJ. Several pages later the Administrator plainly rejected the interpretations offered by the ALJ and the parties, saying that they "place undue emphasis on the text of the words 'properly maintained' without examining the purpose or function of the 'properly maintained' criterion in the overall statutory scheme." JA III:1211–1212.

Although the Administrator never thereafter discussed the relationship between subsections (b)(2)(A) and (c)(1), he obviously rejected the theory that they are in pari materia, since he did not hold that maintenance in accordance with Chrysler's specifications is the only "proper" maintenance for purposes of § 207(c)(1). This is not to say, of course, that the Administrator found "proper maintenance" to have no relation to obedience to the manufacturer's instructions. Rather, "proper maintenance" for purposes of § 207(c)(1) is maintenance in ac-

cordance with the manufacturer's instructions, taking into account the effect of design defects and other factors caused by the manufacturer that affect the true state of maintenance in actual use. JA III:1244.

120. S.Rep. No. 1196, 91st Cong., 2d Sess. 29, reprinted in Library of Congress Congressional Research Service, Environmental Policy Division, 93d Cong., 2d Sess., 1 A Legislative History of the Clean Air Amendments of 1970 at 429 (Comm. Print 1974) (hereinafter cited as Leg. Hist.).

121. Air Pollution—1970: Hearings on S. 3229, 3466, 3546 Before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 91st Cong., 2d Sess. 1072 (1970), reprinted in Leg.Hist. at 1072.

122. See Part I supra.

enforced in two ways: through warranty provisions and recall actions. Congress recognized, however, that some responsibility for deterioration of emission control equipment in actual use must be borne by the vehicle owners, whose negligence or abuse in maintenance and operation can frustrate or disable the emission controls. Thus the warranty and recall provisions of the Act included a requirement that owners maintain and operate their vehicles properly. As Senator Muskie explained:

> We understand that it is not presently possible to build maintenance-proof, clean car, but that it is possible—with the use of a system that is built with some durability in it and some responsibility imposed upon the operator—to assure reasonably clean operation of such an automobile. We have to have the two. One without the other is like a one-legged man.

*Id.* at 33094–33095, *Leg.Hist.* at 332. To promote better maintenance Congress required manufacturers to provide vehicle purchasers with written instructions on proper maintenance. These instructions should be "reasonable and uncomplicated," S.Rep. 1196, *supra*, at 30, *Leg.Hist.* at 430, so that they can be understood and followed by vehicle owners. In order to take advantage of the warranty protection owners must do their part to keep the emission system in good working order. Both the explicit language of the statute [123] and the legislative history [124] make clear that owners facing sanctions for emission control failures cannot shift the expense of remedying the nonconformity to the manufacturer unless they can prove that they maintained the system in accordance with the written instructions of the manufacturer.

Chrysler contends that this clear language and legislative history with respect to the warranty provisions must apply with equal force to the recall provisions. However, the legislative history does not support this view. Rather, that history indicates that Congress realized that vehicle owners are often unable to find mechanics to service their vehicles competently, and that Congress therefore placed the burden on the auto manufacturers to design an emission control system that would effectively reduce auto emissions despite the poor performance of the maintenance industry. This is evident from a colloquy between Senators Allott and Muskie.

Senator Allott complained that poor maintenance facilities represented a "weak spot" in the bill. He said that "to secure competent maintenance on a car at the present time in any respect is almost an impossibility." 116 Cong.Rec. 33095, *Leg. Hist.* 332–333. Senator Muskie agreed with Senator Allott that the "greatest problem the industry faces is the shortage of mechanics across this country," but stated that "[w]e cannot by legislation remake the automobile industry." *Id., Leg.Hist.* 334. He attributed the maintenance problems to the manufacturers' insistence on using the internal combustion engine and said, "We cannot solve the problem of whatever technology the industry chooses to put its bets on. All we can do is set the standards. The automobile industry has created all of the problems from the top to the bottom." *Id., Leg.Hist.* 335. He concluded:

> So, if the bill is weak in not providing for the solution of the maintenance problem, I would welcome an amendment that would cure that weakness. But I do not think there is any way of writing a law that will create maintenance capability all across the country. Only the automobile industry can do that.

*Id.* at 33096, *Leg.Hist.* at 335.

If Congress thus believed that "only the automobile industry" could solve the maintenance problem, it was logical to pass an Act placing primary responsibility on the

---

**123.** Section 207(b)(2)(A), 42 U.S.C. § 7541(b)(2)(A) (Supp. II 1978). *See* note 115 *supra*.

**124.** Senator Muskie said that "unless the individual operator meets the manufacturer's instructions with respect to maintaining the car as it relates to the clean air provisions of the automobile, the warranty will not be available to the owner." 116 Cong.Rec. 33094 (1970), *Leg.Hist.* at 332.

design capability of the manufacturers rather than on the maintenance capability of mechanics and owners. Thus, despite Senator Allott's objections, Section 207 was left unchanged. The primary responsibility for emission control was left with the manufacturers; they were expected to solve the maintenance problem by designing a system that would be less susceptible to faulty maintenance. Admittedly, Congress did not intend liability to rest on the manufacturer if the condition of poor maintenance could be attributed to owners or mechanics. If, however, design defects of the manufacturer proved to be responsible for the condition of poor maintenance, the legislative history would indicate that Congress did indeed intend responsibility for remedy to rest on the manufacturers.

D. *Function of the "Properly Maintained" Criterion in Achieving the Purposes of the Act*

We cannot interpret Section 207 "in a manner which runs counter to the broad goals which Congress intended it to effectuate." *See FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). The Administrator warned that Chrysler's interpretation was in "evident disregard for the goals of the Clean Air Act." JA III:1213. The broad purpose of the Clean Air Amendments of 1970 is plain: "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]" Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1) (Supp. II 1978). The purpose of the recall provisions seems equally plain: to give auto manufacturers an incentive to design and construct their emission control systems to meet standards in actual use for the estimated life of the vehicle. The theory underlying the provisions is that the manufacturers are better equipped than Congress or EPA to design a system that would meet federal emission standards. By setting standards, and leaving the auto manufacturers free to design and construct vehicles that would satisfy them, EPA can harness the forces of American industrial ingenuity to solving the serious national problem of vehicle-produced air pollution.

From this perspective, it would make little sense to impose liability on the manufacturers for conditions of nonconformity caused by the actions of vehicle owners or mechanics. Unless the cause of the nonconformity is within the manufacturer's control, an imposition of liability would be an unwarranted financial burden on the manufacturers, unrelated to the strategy of forcing technological progress. Thus the "properly maintained and used" criterion in Section 207(c)(1) is best understood as an acknowledgement of the limited ability of manufacturers to prevent those nonconformities primarily caused by intentional or negligent faulty maintenance by owners and mechanics.

Chrysler's contention—that manufacturers have no responsibility for nonconformities if the owners failed to attain maintenance in accordance with the manufacturer's precise written specifications—would far exceed the purpose of the "properly maintained" criterion and would undermine the broad objectives of the Act. Such an interpretation would strip the manufacturers of a large part of the incentive to design emission systems that would operate effectively while in actual use. The manufacturer could prescribe maintenance that is difficult to perform or incompatible with smooth operation of the vehicle, but bear no responsibility for the natural consequence of such design—so long as the vehicles passed the initial certification tests. We could expect little or no progress in development of better, more maintenance-free emission controls.

The Administrator's construction—making the manufacturer responsible for nonconformities primarily attributable to design defects knowingly produced by the manufacturer—would better serve to promote the purposes of the Act. At the same time it would retain protection for those manufacturers striving, within the limits of technology, to produce effective emission controls. We agree with the Administrator that if a manufacturer knowingly used an

emission control system resulting in large numbers of misadjustments, instead of a less sensitive and more durable system available to it, it should be held responsible under the Act for the consequences and be subject to a recall.

We reject Chrysler's suggestion that the responsibility of the manufacturer must be judged by maintenance performed in a laboratory setting, rather than by that typical of a mechanic's shop or a dealership. It does the public little good to pay higher costs for cleaner automobiles, only to find that they fail emission standards except when specially adjusted by trained mechanics operating under laboratory conditions. If design defects make "proper maintenance" so difficult that even Chrysler dealers do not perform it, then such "proper maintenance" is beyond the reach of the average car owner. Use of a laboratory-pure standard of "proper maintenance" is contrary to the "actual use" standard of the Act.

Although we admit that the language of Section 207(c)(1) is open to more than one interpretation, we conclude that the legislative history and the purpose of the "properly maintained" criterion require that we affirm the interpretation adopted by the Administrator.

### E. *Retroactive Rulemaking*

■ Chrysler charges that the Administrator's interpretation of the statute is tantamount to retroactive rulemaking.[125] It points out that the Administrator promulgated new regulations on January 12, 1979, requiring prototype and production-line vehicles starting with the 1981 model year to pass federal emission standards no matter how their engines are adjusted within the physically adjustable range. The vehicles thus must satisfy federal standards even when misadjusted. *See* Control of Air Pollution From New Motor Vehicles and New Motor Vehicle Engines: Certification and

Test Procedures, 44 Fed.Reg. 2960 *et seq.* (1979).[126] Chrysler claims that the order under review applies this new requirement—prospectively announced for model years starting with 1981—to Chrysler's 1975 model year vehicles. It claims that no one in 1975 knew that a manufacturer could be held responsible for misadjustments, and that this additional responsibility could lawfully be imposed only by a prospective rulemaking, like that of January 12, 1979, and not by a retrospective adjudication.

We cannot agree with this argument. The recall order recognizes no duty of Chrysler other than that imposed by the Act: to design and construct vehicles that would satisfy emission standards in actual use, when properly maintained, for five years or 50,000 miles. Chrysler was aware of this statutory duty, and of the consequences that would attach in the event of its failure to comply. According to the order under review, Chrysler chose to employ cheaper and less effective emission control equipment, in the face of evidence that misadjustments serious enough to cause widespread nonconformities were likely. Chrysler thus took a gamble that the idle adjustment method of providing sufficient oxygen to the catalytic converter would work, or that EPA would be unable to prove its case for a recall. The statute demands that Chrysler bear the consequences of its decision.

In any event, the new regulations are quite different from the statutory duty enforced against Chrysler in this case. Under the new regulations manufacturers must take active steps to prevent idle misadjustments by owners and mechanics. But under the Decision and Order Chrysler was merely required to design an emission control system that would not *instigate* such misadjustments. According to the Administrator, the misadjustments now attributed to Chrysler were primarily caused by Chrysler's choice of design; the misadjustments to be prevented by the new regulations are

---

**125.** *See* brief of petitioner at 37–41.

**126.** The new rules were proposed on October 21, 1977, about 10 months after the Administrator initially notified Chrysler of the nonconformities in the recall class. 42 Fed.Reg. 56298 *et seq.* (1977).

those caused by owners and mechanics as well. Thus, Chrysler cannot logically claim that its 1975 vehicles are being judged by 1981 standards. Nor may Chrysler argue that the existence of new regulations governing the 1981 model year should relieve it of the consequences of violating the regulations in effect for the 1975 model year.

## V. SUBSTANTIAL EVIDENCE ISSUES

■■■ Chrysler also challenges the adequacy of the factual basis for the Administrator's conclusions. On this issue we apply the familiar "substantial evidence" test. 5 U.S.C. § 706(2)(E) (1976). "Substantial evidence," as Chief Justice Hughes said, is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). This court may not displace the Administrator's "choice between two fairly conflicting views," even if we "would justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

■■■ The administrative record in this case is voluminous. It contains Chrysler and EPA documents, statements and depositions of EPA and Chrysler officials and experts, results of tests of Chrysler vehicles, and other materials. The evidence at hand is conflicting and contradictory on many points. Nevertheless, after examining with care those portions of the administrative record cited by the parties to support their factual arguments, we conclude that substantial evidence was presented that:

(1) Substantial numbers of recall class vehicles failed to satisfy federal carbon monoxide emission standards when in actual use;

(2) the principal cause of the nonconformities was misadjustment of the idle mixture;

(3) the idle misadjustments were caused, fostered, or encouraged by design defects in the Chrysler system; and

(4) the nonconformities were, or should have been, foreseen by Chrysler.

We have already described the characteristics of the recall class emission system design and maintenance procedures and the results of the Chrysler, state, and EPA tests that underlie the Administrator's conclusions.[127] We need not repeat that discussion here. Here we shall simply identify the major factual disputes, refer to the more important evidence concerning them, and address Chrysler's specific attacks on the sufficiency of that evidence.

A. *Substantial Numbers of Recall Class Vehicles Failed to Satisfy Federal Carbon Monoxide Emission Standards When in Actual Use*

Evidence in the record overwhelmingly shows that a large majority of the recall class vehicles in actual use failed the carbon monoxide emission tests, and badly. The Emission Factor Program found that 85 percent of the tested vehicles in the recall class exceeded the emission standards, with an average carbon monoxide emission level of over 48 grams per mile—more than three times the permissible level.[128] The Olson Program found 90 percent of its tested vehicles to exceed the standard, with an average emission level two to four times that permitted by the regulations.[129] All other relevant data in the record corroborate this conclusion. Indeed, Chrysler apparently does not seriously dispute that a substantial number of vehicles in the recall class in actual use emit more carbon monoxide than federal regulations permit.[130]

---

127. *See* Part II *supra.*

128. JA III:1175 (Initial Decision, Findings of Fact Nos. 22–23).

129. *See* table at note 71 *supra.*

130. Chrysler's argument that misadjudgment of emission control systems is "an industrywide problem, not limited to Chrysler vehicles," brief of petitioner at 9, in effect admits that many of the recall class vehicles are in violation of the emission standards.

Chrysler does, however, criticize the testing program used to generate the evidence in the record. First, Chrysler points out that the Olson test data, considered alone without the Emission Factor Program results, establish that only 49 percent of the 400 CID vehicles in the recall class can be predicted with 95 percent accuracy to be in violation of the standards.[131] This does not, however, convince us to reject the Administrator's findings. This selective use of part of one study barely brings the proportion of nonconforming vehicles below half. And taking into consideration the results of the Emission Factor Program as well as the Olson Program, the percentage of 400 CID vehicles in violation rises to 79 percent.[132] The evidence taken as a whole shows that by any standard a "substantial number" of the vehicles were in nonconformity.[133]

Chrysler also argues that the Administrator should have considered only the after-maintenance portion of the Olson Program when he decided whether a "substantial number" of vehicles in the recall class were in nonconformity.[134] Chrysler points out that "[e]stimated CO failure rates for the 360's and the 400's based on Olson data, are 3.7% and 8.3% respectively," after maintenance in precise accordance with Chrysler's specifications is performed. Brief of petitioner at 90. This argument, however, relies on Chrysler's legal theory—rejected by the Administrator and this court—that the manufacturer is not accountable for nonconformities caused by misadjustment. For purposes of this recall action, we agree with

the Administrator that the relevant data are those concerning recall class vehicles in actual use, not those subjected to elaborate maintenance.

Finally, Chrysler argues that the Olson test sample was not representative of recall class vehicles nationwide, for three reasons. First, all vehicles in the Olson test were from a single metropolitan area, Wayne County, Michigan. Second, many vehicle owners refused to participate in the tests. Third, sample size was small—only 20 vehicles.[135] The Administrator acknowledged these defects in the test sample, but stated: "The small errors pointed to by Chrysler are really nothing more than minor deviations from the type of perfection one might expect in a textbook on sampling procedures, but not in the real world." JA III:1234.[136] Without disparaging Chrysler's legitimate concern for the niceties of sampling technique, we conclude that the evidence is so unambiguous, and so amply supported by other tests conducted under a variety of conditions in many states, that the Administrator was justified in concluding "that the Olson and Emission Factor results are representative of the entire class of recall vehicles." JA III:1246.[137]

Chrysler lodges several similar complaints about the procedures used in the Emission Factor Program. However, it says:

The Emissions Factors Program was no doubt valid for the purpose for which it was designed and conducted, namely, measuring emissions of vehicles in whatever condition of use and maintenance

---

131. Brief of petitioner at 88; *see* JA III:1241 (Decision and Order).

132. JA III:1241 (Decision and Order).

133. We see no reason why a "substantial number" in this context must necessarily mean more than half. On this record we need not decide precisely where the dividing line is, but we agree with the Administrator that a "substantial number" of nonconforming vehicles is any number large enough to show that a "systematic or pervasive problem in a particular class or category of vehicles" exists. *See* JA III:1251.

134. Brief of petitioner at 90.

135. Brief of petitioner at 91–94, 96.

136. *See* note 87 *supra*.

137. Chrysler also says that vehicles with removed or damaged "limiter caps" should not have been included in the test. Brief of petitioner at 95. However, since the faulty design of the "limiter caps" was found to be one cause of the nonconformities, the inclusion of such vehicles was entirely appropriate. We also see no reversible error in the use of EPA employees to conduct telephone interviews of test participants. *See id.* Other than an appearance of some slight impropriety, Chrysler has not shown that any bias might have resulted from this practice.

they happen to be. The data is however totally *invalid for recall purposes which requires results only from properly maintained vehicles.*

Brief of petitioner at 98. This objection to the Emission Factor Program is without merit. Nowhere in the Act or in the regulations appears any requirement that vehicles tested for in-use nonconformities must be prescreened to eliminate those improperly maintained. The Emission Factor Program confirms the results of the Olson Program: that large numbers of recall class vehicles in actual use emit more carbon monoxide than the regulations permit. Admittedly, the Emission Factor Program provides little evidence of *why* the vehicles fail to conform, but it was not used for that purpose. For the use to which it was put by the Administrator, the Emission Factor Program was probative.[138]

B. *The Principal Cause of the Nonconformities Was Misadjustment of the Idle Mixture*

The record leaves little doubt that the cause of the widespread nonconformities in the recall class was that their carburetor idle mixtures were not set to sufficiently "lean" fuel-to-air ratios. The Olson Program showed that the large majority of vehicles in the class could be brought into conformity by precise adjustment of the idle in accordance with Chrysler's specifications.[139] Chrysler agrees with this factual conclusion, quoting in its brief the Administrator's conclusion that

the record in this proceeding conclusively establishes that the cause of excessive carbon monoxide emissions in the Chrysler recall class vehicles is attributable to misadjustments of the carburetor idle mixture adjustment and that such misad-

justments were performed in a manner *inconsistent with or contrary to the manufacturer's written specifications.* [J.A. III:1206–07 (emphasis added).]

Brief of petitioner at 15.

C. *The Idle Mixture Misadjustments Were Caused, Fostered, or Encouraged by Design Defects in the Chrysler System*

We need not repeat our lengthy description of the Chrysler emission control system: its reliance on nice adjustments of the idle mixture screws rather than installation of $50 air pumps, its sensitive adjustment screws, its inadequate limiting system, its reliance on equipment that frequently is unavailable or out of order, its cumbersome procedure. Nor need we describe again the baneful effects of so "lean" an air-fuel ratio on the driveability of the automobiles. Chrysler has placed the mechanic in a serious dilemma. The mechanic is put to a choice between adjusting the idle setting for pollution control purposes and satisfying the customer. Generally, though not always, these prove to be conflicting goals. We find the record especially revealing with respect to Chrysler dealership mechanics. When surveyed a large majority of such mechanics stated that it is not usually possible to achieve "acceptable engine smoothness and driveability" when the idle mixture is set to Chrysler's specifications. They said that proper adjustment generates customer complaints of rough idle, hesitation, and other forms of poor performance.[140] This evidence strongly indicates that Chrysler failed to design and construct a vehicle that could meet emission standards in everyday circumstances and still satisfy the legitimate demands of its customers for cars that run smoothly and

---

**138.** Chrysler also argues that the Administrator improperly considered evidence based on the "short" test rather than the "Federal" test procedure. Reply brief for petitioner at 34–37. We find no error on this point. We agree with the Administrator that most evidence in the record indicates that vehicles with a 1.5% to 2.0% carbon monoxide concentration in the exhaust, as measured by the "short" test, generally fail the "Federal" test as well. JA III:1249. Moreover, the Administrator primarily relied on the Olson and Emission Factor Programs, which used the "Federal" test procedure. The "short" test results were merely used for corroborative purposes. JA III:1249.

**139.** *See* text and notes at notes 18, 65–71 *supra.*

**140.** JA V:1977–1978.

well.[141] We find that there was substantial evidence in the record to support the Administrator's conclusion that misadjustments "were encouraged or fostered by the design of Chrysler's emission control system and its carburetor adjustment procedures," JA III:1207, and that "the service industry's contribution is the inevitable byproduct of Chrysler's emission system design and service procedures." JA III:1215.

Chrysler argues:

The "defects" to which the Administrator points are not defects at all, but are at most alternative designs. All of the evidence admitted below shows that the design of the carburetor and emission control system on the recall vehicles was within the state-of-the-art at the time these vehicles were designed and manufactured and will meet the emissions standards when properly maintained. There is no substantial evidence in the record to the contrary and none which shows that this design and the associated maintenance procedures were in any way "defective."

Brief of petitioner at 11. Many a Chrysler witness testified that Chrysler's system was within the "state of the art."[142] On this issue of automotive engineering judgment, however, we must defer to the technical expertise of the Administrator. And it is impossible to say that his contrary conclusion was without substantial support in the record, given his extensive analysis of each

of the deficiencies in the design of the Chrysler system. Moreover, we find it suggestive that Chrysler's recall class vehicles, supposedly within the "state of the art," performed so poorly in comparison with their competitors. Data underlying the Motor Vehicle Tampering Survey[143]—added to the record after the close of the proceeding at Chrysler's insistence—indicated that the average carbon monoxide concentration in the emission of 1975 Chrysler vehicles was 3.87 percent, as contrasted to an average of 1.72 percent for General Motors and 0.88 percent for Ford.[144]

When Chrysler states that the recall class vehicles "will meet the emissions standards when properly maintained," brief of petitioner at 11, it apparently means that they will do so if adjusted by experts under laboratory conditions precisely in accordance with Chrysler's specifications. There is no evidence in the record that ordinary mechanics performing ordinary maintenance often succeed in adjusting the recall class vehicles to Chrysler's specifications while achieving satisfactory driveability.[145] As the Administrator said, the maintenance actually available to owners of recall class vehicles is "totally unlike" the precise maintenance to which Chrysler refers.

D. *The Nonconformities Were, or Should Have Been, Foreseen by Chrysler*

Evidence in the record indicates that automotive engineers in the late 1960's and

---

141. Chrysler objects to the Administrator's reliance on evidence of "driveability" problems in the recall class. Brief of petitioner at 49–54. It argues that, in the absence of "an official definition or test for driveability," *id.* at 49, such reliance violated the requirement of § 207(c)(1) that a recall be based on objective standards. We reject this reasoning. EPA employed "objective standards" for determining that a "substantial number" of vehicles in the recall class were in violation of the emission standards. It used the concept of "driveability" solely to show a causal connection between the observed misadjustments and the defects in the design of Chrysler's emission controls.

142. *E.g.*, JA I:29–36 (Cook testimony); JA I:37–40 (Sherwin testimony); JA II:635–638, 656–657 (Heinen testimony).

143. *Reprinted at JA IV:1575–1684.*

144. JA III:1264 (Denial of Motion for Reconsideration).

145. Chrysler points to the testimony of an EPA investigator, Mr. Gockel, to prove that the average mechanic is capable of performing Chrysler's adjustment procedures. Reply brief of petitioner at 28. Mr. Gockel had said, "A high percentage of the mechanics had adequate knowledge, skills and equipment to perform carburetor adjustments according to manufacturer's procedures and specifications if they were motivated to do so." JA V:1972. The problem identified by EPA is not mechanics' lack of skill or training, but rather the Chrysler design, which induces mechanics to save time and solve driveability problems at the expense of pollution control.

early 1970's—including Chrysler engineers—recognized the problem of idle misadjustments in the field and its relation to excessive carbon monoxide emissions. EPA placed some 14 reports, speeches, and articles written between August 1966 and February 1974 in the record to show that the problem was generally understood in the industry.[146] In May 1973 Chrysler itself cited several surveys showing widespread misadjustment of the idle mixture of vehicles in the field, in a petition for suspension of the 1976 emission standards.[147] That petition indicates that Chrysler understood the problem and was aware that a solution would be necessary in order to meet federal emission standards.

In late 1973 Chrysler undertook a field study of the emission control system to be used in the recall class. It equipped a fleet of about 100 1974 vehicles with the emission control equipment planned for the 1975 model year. Half of these vehicles contained air pumps; half relied on idle mixture adjustments. The test showed that vehicles equipped with air pumps were able to conform to federal and California emission standards, but that widespread misadjustments of the idle mixture in the remaining vehicles caused emissions in excess of the standards.[148] In an intra-company memorandum Mr. J. E. Stoyack of the emission development testing division of Chrysler stated that "[t]he effect of idle CO level on 1975 emission levels was not detectable on California vehicles [those equipped with air pumps]"; he also stated that "1975 emission levels on Federal vehicles [those relying on idle adjustments] were significantly affected by changes in idle CO level." JA V:2005. In conclusion Mr. Stoyack said:

> Without an air pump, oxygen for catalytic oxidation in the Federal system is limited and increased idle and off-idle

richness readily produces higher emissions due to the decrease in available oxygen.

JA V:2007. There was also expert testimony in the record that Chrysler foresaw, or should have foreseen, the misadjustment problems of the recall class, but failed to take available steps to solve them.[149] For example, EPA witness Mr. Gockel stated:

> I have studied information and "state-of-the-art" technology available to Chrysler and the auto industry at the time the recall class vehicles were being designed and it is my opinion that Chrysler did foresee that the subject vehicles would be misadjusted. It is also my opinion that they should have foreseen that this misadjustment would cause widespread nonconformity with the Federal emission standards in actual use and that they had knowledge of available technology needed to prevent this problem.

JA I:383.

On this record the Administrator concluded:

> * * * The evidence presented by EPA in the form of expert opinion and other proof convinces me that Chrysler should have foreseen the possibility of widespread misadjustments occurring in the recall class vehicles due to the combined effects of the various factors described above and further that such misadjustments would result in a substantial number of the recall class vehicles exceeding the Federal emission standard for carbon monoxide. * * *

JA III:1233.

In response Chrysler rightly points to expert opinion given by Chrysler witnesses indicating that the company did not foresee the problem of widespread idle misadjustments,[150] and to testimony of one EPA en-

146. EPA Exhibits 28–44, see JA I:236–237 (Dietrick testimony).

147. EPA Exhibit 42, see JA I:383–384 (Gockel testimony).

148. JA I:238–240 (Dietrick testimony).

149. See, e. g., JA I:233–235 (Dietrick testimony); JA I:432–433 (DeKany testimony).

150. See, e.g., JA I:11 (Heinen testimony).

gineer involved in certifying the recall class that he was not aware of the problem at that time.[151] However, Chrysler fails to come to grips with the totality of the design defects that made precise adjustment so difficult and unlikely, or to explain how the manufacturer could reasonably have thought, on the basis of evidence then available, that the recall class vehicles would continue to pass federal emission standards when in actual use, away from the tender care of Chrysler laboratory engineers. Moreover, there can be no doubt that Chrysler was aware that installation of air pumps would improve the performance of the emission control system, since it installed air pumps in vehicles sold in California, which had stricter emission standards.[152] The Administrator carefully considered the evidence presented on Chrysler's behalf and found it unconvincing.[153] We believe that substantial evidence supports his conclusion.

Chrysler also argues that EPA may not now require correction of design defects, since such defects were not identified by EPA inspectors during the pre-sale certification testing. Chrysler submitted its carburetor design and maintenance procedures to EPA for testing and EPA approved them.[154] Chrysler reasons that EPA may not now require it to recall the vehicles to correct subsequently discovered defects.[155] We cannot agree with this argument. Admittedly, EPA failed to recognize the defects that have proven to plague the design of the emission controls of the recall class, with the unfortunate result that the vehicles, instead of being corrected at the time, have been foisted upon the environment in violation of the emission standards. This does not mean, however, that EPA is powerless to correct its mistake, or to require Chrysler to correct its violation. The entire purpose of the in-use testing program is to identify classes of vehicles that—despite inspection for emission control and durability at the time of certification—fail to conform to emission standards when in actual use. When such nonconformity is discovered, and when its cause is traced to a defect in design, material, or workmanship then the recall remedy is required. Original certifi-

151. See JA I:162 (Kohnken testimony).

152. See text at notes 7–11 supra.

153. JA III:1234–1239.

154. See JA IV:1503 (Chrysler's preliminary application for model year 1975 certification); JA IV:1516–1517 (certificate of conformity); JA I:23–25 (Robertson testimony). In its brief EPA argues strenuously that the Agency "does not review and approve the service procedures as to reasonableness for purposes of certification." Brief of respondents at 74. So far as we have been able to determine, this assertion is not accurate. The regulation in effect at the time of the certification of the recall class provided, in relevant part:

The manufacturer shall provide to the Administrator * * * a copy of the maintenance instructions which the manufacturer proposes to supply to the ultimate purchaser * * *. The Administrator will review such instructions to determine whether they are reasonable and necessary to assure the proper functioning of the vehicle's emission control system. * * *

40 C.F.R. § 85.075–39(a) (1976). These written instructions include the owner's manual maintenance schedule and the underhood label explaining the idle adjustment procedure, accord-

ing to the Administrator. JA III:1210. The only support EPA offers for its assertion is a citation to the testimony of Mr. Kohnken, who was the leader of the certification team that tested the recall class. But Mr. Kohnken stated that his team performed the maintenance prescribed by Chrysler and determined that it was "reasonable." JA I:147–149, 156–157.

Q Is the idle set procedure one of the procedures which is called for in the part one of the application?
A Yes.
Q Is that something else though which would be reviewed by your people in analyzing the part one?
A Yes.
Q Is the same standard used there as you mentioned earlier in reviewing the shop manuals, that this was reasonable engineering judgment as to what you would say is proper or improper?
A Yes, I would imagine so, yes.

JA I:150 (Kohnken deposition). Mr. Kohnken also supplied an example of an instance in which EPA denied certification because the maintenance procedures were unreasonable. JA I:151–152. See also JA I:21–28 (Robertson testimony).

155. Reply brief of petitioner at 13–16.

cation does not relieve the manufacturer of its obligations under the Act.[156]

## VI. CONCLUSION

In sum, we agree with the Administrator's interpretation of Section 207(c)(1) of the Clean Air Act, 42 U.S.C. § 7541(c)(1) (Supp. II 1978), that a manufacturer may be held responsible in a recall action for nonconformities resulting from misadjustments, if such misadjustments were principally caused by the design of the emission control system and maintenance procedures, and if the manufacturer foresaw or should have foreseen the problem and failed to take available steps to obviate it. We find substantial evidence in the record to support the Administrator's conclusion that Chrysler vehicles in the recall class fail to conform to federal carbon monoxide emission standards when in actual use, although properly maintained and used, and thus that Chrysler must submit a plan for remedying the nonconformity, in accordance with the Act. The Decision and Order is

*Affirmed.*

---

156. Chrysler also raises objections based on alleged evidentiary and discovery errors by the ALJ. *See* text at notes 79 and 107 *supra*. These objections were rejected by the Administrator, JA III:1258–1259, and we agree with his conclusion. Certain documents were withheld from Chrysler on the basis of the attorney-client privilege, work product doctrine, or executive privilege. The ALJ examined these documents *in camera* and verified that all relevant factual materials therein were disclosed to

Chrysler in other form. In addition, Chrysler was denied the right to depose a certain EPA official, but was permitted instead to depose another official of equal familiarity with the subject. Although Chrysler raises these evidentiary rulings on appeal, it does not make a credible showing that it was prejudiced by them, and we decline to reverse on account of them. Nor do we find reversible legal error in the other evidentiary rulings of the ALJ.